In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-2201

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JERMAINE STAPLETON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 20-cr-00066 — **William M. Conley**, *Judge.*

ARGUED JANUARY 28, 2026 — DECIDED JULY 16, 2026

Before HAMILTON, MALDONADO, and TAIBLESON, *Circuit Judges*.

MALDONADO, *Circuit Judge*. After defendant Jermaine Stapleton violated numerous conditions of his supervised release, the district court revoked his supervision and sentenced him to 24 months' imprisonment and four years' supervised release. Stapleton appeals, arguing that the court impermissibly considered retributive factors in imposing the sentence. We disagree and affirm.

## I. Background

Stapleton, who had been convicted of possessing metham-phetamine intended for distribution, was released on super-vision in September 2024. But within two months of release, Stapleton failed to attend mandatory random drug tests and tested positive for both fentanyl and methamphetamine. His probation officer therefore filed a petition to revoke his super-vised release, and the district court issued a warrant for Sta-pleton's arrest. Stapleton was eventually arrested in Minne-sota on state charges of possessing fentanyl and providing false information to an officer. And after a conviction on the latter charge, he was sentenced by the state court to time served and transferred to federal custody for adjudication of the pending revocation petition.

The district court revoked Stapleton's supervised release, but upon Stapleton's request, the court deferred sentencing him so he could enter a residential drug treatment program. The court had been skeptical of Stapleton's proposal because Stapleton had never demonstrated sustained sobriety, but it nonetheless permitted Stapleton to seek treatment, with the warning that if he failed to comply with his terms of supervi-sion again, he would face a longer term of incarceration. Un-fortunately, Stapleton failed to report to the treatment pro-gram as scheduled. Stapleton was again arrested in Minneap-olis about a week later for drug possession and providing false information to an officer.

A hearing on the deferred sentencing occurred in July 2025. At the hearing, the district court considered Stapleton's recent violations—including repeated drug use, failure to complete treatment, failure to attend drug screenings, and failure to report to his probation officer. The court also com-

mented that Stapleton's "crash and burn in response to a unique opportunity to own his profound drug addiction demonstrates just how far he is from confronting that need." And the court weighed whether a sentence within the 21- to 27-month advisory range would be enough to "send th[e] message" to Stapleton that "there are consequences for actions, in this case, the defendant lacking the insight into his own needs and repeating a pattern that now goes back decades and somehow expecting a different result." After hearing from the parties, the court spoke with Stapleton and encouraged him to seek treatment and "follow a different path."

The court then imposed a within-guidelines sentence of 24 months, followed by another four-year term of supervised release. The court explained that its intent with the sentence was "to hold [Stapleton] accountable for his violations, to protect the community, and to promote specific and general deterrence." It added that it hoped Stapleton would accept help from others to change his behavior moving forward.

## II. Discussion

On appeal, Stapleton contends that the district court improperly considered retributive factors when determining his revocation sentence. The parties disagree on the proper standard of review, but we need not resolve their dispute—the district court did not err under any standard.

Under 18 U.S.C. § 3583(e)(3), a court may sentence a defendant to a term of imprisonment upon revocation of supervised release based on its consideration of certain factors set forth in § 3553(a). For example, a court may consider the need for the sentence imposed to afford adequate deterrence to criminal conduct; to protect the public from further crimes of

the defendant; and to provide the defendant with needed ed-
ucational or vocational training, medical care, or other correc-
tional treatment in the most effective manner. 18 U.S.C.
§§ 3583(e)(3), 3553(a)(2)(B)–(D).

But courts may not consider the retributive factors of
§ 3553(a)(2)(A) in revocation proceedings—namely, the need
for the sentence imposed to reflect the seriousness of the of-
fense, to promote respect for the law, and to provide just pun-
ishment for the offense. *Esteras v. United States*, 606 U.S. 185,
195–97 (2025). In the context of a revocation hearing, the "of-
fense" referenced in § 3553(a)(2)(A) is "the underlying crime
of conviction, not the violation of the supervised-release con-
ditions." *Id.* at 193–94. In short, a district court cannot formu-
late a revocation sentence based on "the need to exact retribu-
tion for the defendant's underlying crime." *Id.* at 194–95. But
it can still consider the "nature and circumstances" of that un-
derlying offense for purposes of "deterrence, incapacitation,
and rehabilitation." *Id.* at 200.

We consider a district court's sentencing remarks holisti-
cally and in context. *United States v. Dawson*, 980 F.3d 1156,
1163–64 (7th Cir. 2020); *see also United States v. Malinowski*, 129
F.4th 431, 435 (7th Cir. 2025). Under any standard of review,
we "must affirm where, taken as a whole, the record demon-
strates that the court based its sentence on considerations au-
thorized by law." *Malinowski*, 129 F.4th at 435 (cleaned up).

A holistic view of the record here assures us that the court
did not impose its sentence as retribution for Stapleton's un-
derlying offense. Rather, the court heavily invoked "forward-
looking" themes of rehabilitation and deterrence. *See Esteras*,
606 U.S. at 196 (emphasis omitted). The court focused on these
factors, discussing Stapleton's need to address his addiction

and expressing its hope that the sentence would set Stapleton on a "different path." And it never referenced punishment, the seriousness of the underlying offense, or the need to promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A). Additionally, the court's decision to impose a within-guidelines sentence, after it had deferred sentencing to allow Stapleton to pursue treatment, further suggests that the sentence was imposed not for retributive reasons but as a last-resort effort to encourage Stapleton to accept help and change his behavior.

Stapleton argues that two specific statements show that the court inappropriately considered retribution for his underlying crime. Stapleton first points to the court's use of the term "consequences" and its expressed desire to send a "message." But read in context, these statements focused on Stapleton's struggles with addiction and the court's hopes for him to find another path to sobriety, not the underlying crime. And consequences are not always punitive. A consequence is simply "[a] result that follows as an effect of something that came before." *Consequence*, Black's Law Dictionary (12th ed. 2024). In fact, Stapleton's attorney discussed his client's need for incarceration in terms of rehabilitation and deterrence, referring to a prison term as a "response" to Stapleton's violations and the "teeth" needed for his success on future supervision.

Stapleton next points to the district court's statement that the sentence was intended to hold him "accountable for his violations." According to Stapleton, this was a backward-looking consideration based solely on retribution for past misdeeds. But even read in isolation, the statement does not show retribution for Stapleton's underlying crime. Being ac-

countable is being "[r]esponsible for the effects of one's actions and willing to explain or be criticized for them." *Accountable*, Black's Law Dictionary (12th ed. 2024). Holding Stapleton responsible for the effects of his failure to address his substance abuse and mental health challenges does not suggest that the court was driven by retribution for his underlying crime.

Further, one permissible purpose of a revocation sentence is "to sanction the defendant's breach of the court's trust—that is, his or her failure to comply with court-ordered conditions arising from the original conviction." *Dawson*, 980 F.3d at 1162. And holding defendants responsible for that breach of trust is permissible. *Id.* The court here trusted (albeit cautiously) that Stapleton would address his substance abuse and mental health challenges when it deferred Stapleton's sentence and allowed him to seek treatment. The court warned that if Stapleton "crashed and burned again," it "would be inclined to give [Stapleton] a sentence at the top of the guideline range." When Stapleton did just that, the court was permitted to sanction that breach.

*     *     *

The judgment of the district court is AFFIRMED.

TAIBLESON, *Circuit Judge*, concurring. I join the court's opinion in full. I write separately to address the standard of review, an issue that should be straightforward but that routinely trips up our court and the criminal lawyers who appear before us.

The question is a simple one that arises often: What standard of review applies when a criminal defendant claims on appeal a sentencing error that he did not raise below? That question arises here because Stapleton did not say anything below about the district judge's purportedly improper sentencing remarks. On appeal, the parties devoted over a dozen pages of briefing to the standard of review, with the government advocating for plain-error review and Stapleton seeking *de novo* review. Ultimately, the court (quite reasonably) avoids the question, finding the merits—under any standard of review—easier to resolve.

This is not a hard question in any other circuit. It has become difficult here, and here alone, because of our unique treatment of Federal Rule of Criminal Procedure 51(a). In its entirety, Rule 51(a) states: "Exceptions to rulings or orders of the court are unnecessary." An "exception" is a term of art no longer in common use. It refers to a distinct procedural step that created a record of the issues for appeal at a time before court proceedings were transcribed: Litigants would take "exception" to the adverse rulings they wished to appeal, commonly by submitting a formal document called a "bill of exceptions." When stenographic reporting became widespread, it rendered that additional record-generating procedure unnecessary because the court transcript could serve the same purpose, and the Rules therefore eliminated it.

Importantly, an "exception" was *not* a substitute for the litigant raising his argument before the trial court in the first instance. Rule 51(b) still requires that a party "inform[] the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." FED. R. CRIM. P. 51(b). If a party fails to bring an issue "to the court's attention," we may review it only for plain error on appeal. FED. R. CRIM. P. 52(b). By contrast, of course, there are no consequences for a litigant who fails to file a post-ruling "exception," as that procedural step is now "unnecessary." FED. R. CRIM. P. 51(a).

Our decisions, however, have repeatedly conflated the outdated procedural device that is an "exception" (Rule 51(a)'s province) with the fundamental requirement that parties "inform[] the court" of their arguments (Rule 51(b)'s domain). As a result, we have often used Rule 51(a) to find it "unnecessary" for a party to raise an issue at all. We have therefore applied *de novo* review to claims that were never presented in the district court.

As described below, those decisions depart from Rule 51(a)'s text and history. They are also in considerable tension with Supreme Court precedent and have created a lopsided circuit split. And even putting aside the merits of this approach, it is not working for us particularly well. As often happens when a court departs from the text of the law, we have encountered hard questions about Rule 51(a)'s scope and have had to draw our own complicated and unpredictable lines around its application. We should change course.

**I.**

The Federal Rules of Criminal Procedure reflect the ordinary issue-preservation principles familiar to most litigators: If "a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object." *Puckett v. United States*, 556 U.S. 129, 134 (2009). He does so by "informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." FED. R. CRIM. P. 51(b). That contemporaneous-argument requirement "gives the district court the opportunity to consider and resolve" any issues and "prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Puckett*, 556 U.S. at 134 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 89 (1977)). We thus expect lawyers "to lodge their objection[s] as soon as something problematic happens, even if it means interrupting a judge mid-ruling." *United States v. Beltran-Leon*, 9 F.4th 485, 499 (7th Cir. 2021). And if a "defendant does not make the district court aware" of a claimed error, either by preemptively arguing in favor of a course of action or subsequently objecting thereto, then "the defendant's appeal will be governed by plain-error review." *Esteras v. United States*, 606 U.S. 185, 202 (2025); *see* FED. R. CRIM. P. 52(b).

In theory, those principles are well settled. But in our circuit, their application to sentencing appeals has been complicated by our interpretation of Rule 51(a). Below, I attempt to survey the many things we have written about Rule 51(a). But first, I consider what Rule 51(a) means from first principles.

**A.**

Rule 51(a) was promulgated in 1944 and became effective in 1946. At the time, before a non-substantive restyling broke the Rule into subsections, it was simply the first clause of Rule 51; it has never been substantively amended, and so I refer to it herein as "Rule 51(a)" for clarity. Then as now, Rule 51(a) did only one thing: it rendered "exceptions" to "rulings or orders" "unnecessary." The original version of the Rule elaborated (in language that has now been adapted into subsection 51(b)) that "for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor." FED. R. CRIM. P. 51 (1946).

The advisory committee notes accompanying the Rule's enactment observed that "[m]any States" had recently "abolished the use of exceptions in criminal and civil cases." FED. R. CRIM. P. 51 advisory committee's notes to 1944 enactment (citing then-recent statutes from California, Michigan, Ohio, and Oregon). The advisory committee explained that Rule 51(a) did the same for federal criminal cases, and in doing so was "practically identical" to (also then-recent) Rule 46 of the Federal Rules of Civil Procedure. *Id.*

Thus the obvious (and critical) question in applying Rule 51(a) is, what is an "exception"? The word is not a familiar one to modern litigators—perhaps unsurprisingly, given that the practice was widely eliminated nearly a century ago. But around the time of Rule 51(a)'s enactment, an "exception" was a familiar feature of trial practice. And—importantly for purposes of understanding our own case law—it was not the

same as an argument or an objection.

Instead, an "exception" was a pre-stenography mechanism for litigants to create a record of the adverse rulings they might pursue on appeal. Before court reporters transcribed proceedings in their entirety, there was no easily accessible record of all the arguments and objections made at trial and how they were resolved. While a contemporaneous argument served the important purpose of alerting the court to a potential error, it did not sufficiently document that error for future review. To effectuate that record-keeping purpose, something more was needed—and that something more was the "exception." Thus, after a litigant made and lost an argument, and the court issued an adverse ruling, the litigant would take "exception," specifically denoting that adverse ruling for appeal. As Justice Story explained: "In the ordinary course of things, at the trial, if an objection is made and overruled, as to the admission of evidence, and the party does not take any exception at the trial, he is understood to waive it." *Poole v. Fleeger*, 36 U.S. (11 Pet.) 185, 211 (1837).

The precise "exception" procedure varied by court. But commonly, litigants would create a "written statement of objections to the decision of a court" called a "bill of exceptions," which would be presented to the trial judge for certification. *See, e.g.*, *Bill of Exceptions*, Bouvier's Law Dictionary (1934); *see also, e.g.*, *Wainer v. United States*, 87 F.2d 77, 80 (7th Cir. 1937) (noting that "in the absence of a bill of exceptions this court is without jurisdiction to consider any assignments of error" except challenges to the form of the indictment).

The 1940 edition of Wigmore's *Evidence* treatise considered "exceptions" at some length, explaining that the exception procedure was a supplemental step after a party had

made an argument or objection: "No matter how plain and correct the objection, the exception is still necessary at common law, even though the objector and the exceptor be the same party." 1 John Henry Wigmore, *Evidence in Trials at Common Law* § 20, at 354 (3d ed. 1940). Other contemporary sources were consistent, including our own case law, describing the "exception" as a step that comes *after* a party has argued and lost his point. *See, e.g.*, *Exception*, Black's Law Dictionary (3d ed. 1933) ("A formal objection to the action of the court, during the trial of a cause, in refusing a request or overruling an objection; implying that the party excepting does not acquiesce in the decision of the court, but will seek to procure its reversal, and that he means to save the benefit of his request or objection in some future proceeding."); *Wainer*, 87 F.2d at 80 (describing the "bill of exceptions" as "essential to review" various assignments of error, including "objections that the verdict and judgment are without basis in evidence").

By the time Rule 51(a) was enacted, "the defeated counsel's announcement of an exception at the time of the ruling ha[d] become less important" because in "modern practice, in the United States, [] the proceedings [were] usually reported stenographically." 1 Wigmore, *Evidence* § 20, at 355. "Hence," Wigmore explained, "a modern movement is prevailing to *abolish the exception*"—citing as examples Federal Rule of Civil Procedure 46 (1938) and several state statutes providing that formal exceptions are not required after arguments or objections have been lodged. *Id.*; *see, e.g.*, MICH. COMP. LAWS § 17316 (1929) ("It shall be not necessary in the trial of any criminal cause to except to any ruling or action of the court, if an objection thereto was fully made but an exception shall be deemed to follow as a matter of course."). This makes sense in a world of transcribed proceedings. While litigants still

needed to make their arguments and object to adverse rulings in real time, they did not also need to take the extra (and now superfluous) step of taking "exception," since the transcript provided the necessary record for appeal.

Rule 51(a) followed in that tradition, eliminating the "exception" requirement in federal criminal cases just as Rule 46 had for federal civil cases. Nothing in the Rule's text or enactment history suggests that it also limited the parties' obligation to present their arguments, in substance, to the trial court. To the contrary, the Rule as originally promulgated made plain that, in the absence of a separate "exception" requirement, it suffices for a party to "make[] known to the court the action which he desires the court to take or his objection to the action of the court." FED. R. CRIM. P. 51 (1946). Along the same lines, courts and legislatures considering the issue at the time emphasized that arguments and objections were still necessary even when "exceptions" were not. *See, e.g.*, *Bucy v. Nev. Constr. Co.*, 125 F.2d 213, 218 (9th Cir. 1942) (cited in advisory committee's notes to Rule 51's enactment) (noting that while the *exception* was no longer necessary under Federal Rule of Civil Procedure 46, "of course it is necessary that a man should not spring a trap on the court," and "the rule requires him to disclose the grounds of his objections fully to the court") (internal quotation marks and citation omitted); MICH. COMP. LAWS § 17316 (1929); OHIO CODE ANN. § 13442-7 (Baldwin 1936); CAL. PENAL CODE § 1259 (Deering 1941).

### B.

Outside of our circuit, the limited case law on Rule 51(a) is consistent with that historical understanding.

The Supreme Court has expressly considered Rule 51(a) just once:

> The rulemakers, in promulgating Rule 51, intended to dispense with the need for formal "exceptions" to a trial court's rulings. Rule 51(a); see also Advisory Committee's 1944 Notes on Fed. Rule Crim. Proc. 51, 18 U.S.C. App., p. 591. They chose not to require an objecting party to use any particular language or even to wait until the court issues its ruling. Rule 51(b) (a party may "infor[m] the court" of its position either "when the court ruling or order is made or" when it is "sought"). The question is simply whether the claimed error was "brought to the court's attention." Rule 52(b).

*Holguin-Hernandez v. United States*, 589 U.S. 169, 174 (2020). As the Court described it, Rule 51(a)'s role is very limited; while it eliminated "exceptions," it is Rules 51(b) and 52(b) that require litigants to raise issues or face plain-error review. And the Court has repeatedly and recently emphasized that litigants in federal criminal cases must present their arguments or objections to the district court without ever suggesting that Rule 51(a) bears on that requirement. *See, e.g., Esteras*, 606 U.S. at 202–03 (explaining that a defendant must object to an error in a district judge's sentencing explanation in order to preserve full appellate review); *Holguin-Hernandez*, 589 U.S. at 170 ("A criminal defendant who wishes a court of appeals to consider a claim that a ruling of a trial court was in error must first make his objection known to the trial-court judge."); *Puckett*, 556 U.S. at 134 ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceed-

ing, he must object in order to preserve the issue.").

Our sister circuits' treatment of Rule 51(a)—to the extent they have addressed the Rule at all—is also broadly consistent with this understanding. Although lacking occasion to explore the precise historical meaning of "exception," other circuits have recognized that Rule 51(a) does not excuse parties from raising their claims below. As the Sixth Circuit recently explained, while "Rule 51(a) shows that a party need not make 'formal "exceptions" to a trial court's rulings,'" the party "must bring the claimed error 'to the court's attention' in some way" and "cannot stay 'silent' at the time that a district court could have fixed a problem and save the claimed error for later." *United States v. Robinson*, 133 F.4th 712, 717 (6th Cir. 2025) (citations omitted); *see also, e.g.*, *United States v. Rosemond*, 841 F.3d 95, 106 (2d Cir. 2016) ("Where a defendant has made his position clear, further objections to 'rulings or orders of the court are unnecessary' to preserve a claim of error for appellate review.") (quoting FED. R. CRIM. P. 51(a)); *United States v. Abney*, 957 F.3d 241, 248 (D.C. Cir. 2020) ("We do not require defendants or their counsel to invoke magic words or talismanic language, or to reassert in the form of an exception to the court's decision a claim already preserved when the party asked the court for the desired judicial action.") (citing FED. R. CRIM. P. 51(a)).

Thus precedent from the Supreme Court and our sister circuits is consistent with the original meaning of Rule 51(a): It eliminated the pre-stenography requirement that a litigant take "exception" after a trial court's adverse ruling if he planned to appeal it. But it did not affect a litigant's underlying obligation to raise his claim—*i.e.*, to bring the claimed error or requested relief to the trial court's attention in the first

place.

## II.

In our circuit, Rule 51(a) has lived a very different life. Indeed, in the last twenty years we appear to have more cases citing Rule 51(a) than every other circuit combined. These are almost all sentencing appeals, in which we have—sometimes, not always, and not always for consistent reasons—applied Rule 51(a) to excuse litigants from raising their arguments below in any form and therefore applied *de novo* review to claims never presented to the district court.

## A.

Our earliest case law on "exceptions"—much closer in time to Rule 51(a)'s enactment than we are today—gets things right. In *Ellis v. City of Chicago*, for example, we differentiated between "exceptions" and "objections" in civil cases, explaining that Federal Rule of Civil Procedure 46 "merely abolishes the necessity for formal exceptions to court rulings or orders. It does not abrogate the requirement that a litigant communicate his objection to the district court at the time a ruling is made." 667 F.2d 606, 610 (7th Cir. 1981). And into the early 2000s, we—like other circuits—cited Rule 51(a) only to support the uncontroversial proposition that "when a defendant consistently disputes an issue, and the district court does not specifically elicit objections to the adequacy of the findings, the defendant is not required to interpose a further objection to the adequacy of the district court's findings after the district court has ruled." *United States v. Ortiz*, 431 F.3d 1035, 1039 (7th Cir. 2005) (citing *United States v. Freitag*, 230 F.3d 1019, 1025 n.7 (7th Cir. 2000)). We did not suggest that, at sentencing or otherwise, Rule 51(a) excuses litigants from the ordinary

preservation requirements of Rules 51(b) and 52(b). *See, e.g.,* *United States v. Marvin*, 135 F.3d 1129, 1135 (7th Cir. 1998) (when defendant failed to object to district court's alleged mistakes in delivering his sentence, plain-error review applied).

We outlined that approach to appellate review, and the limited role of Rule 51(a), in *United States v. Bartlett*, 567 F.3d 901 (7th Cir. 2009). In considering whether a defendant had forfeited a sentencing claim, we explained:

> [T]he Rules of Evidence and the Rules of Criminal Procedure require a litigant to make known the position it advocates and to present evidence and argument for that position. These steps are essential to facilitate intelligent decision in the district court. Counsel present positions, and judges then decide. But the rules do not require a litigant to complain about a judicial choice after it has been made. Such a complaint is properly called, not an objection, but an exception. The rule about exceptions is explicit: "Exceptions to rulings or orders of the court are unnecessary." Fed. R. Crim. P. 51(a).

*Id.* at 910. Thus "when an issue is argued before the judicial ruling, counsel need not take exception once the court's decision has been announced." *Id.* (citing FED. R. CRIM. P. 51(a)).

While lacking any reason to explore the exact historical meaning of "exception," *Bartlett* nonetheless correctly differentiated the general concept of an "exception" (unnecessary) from the fundamental requirement to "present positions" (still very much necessary). *Id.* But we soon muddied the wa-

ters by citing *Bartlett* for the incomplete proposition that, un-
der Rule 51(a), a litigant need not "complain about a judicial
choice after it has been made." *United States v. Courtland*, 642
F.3d 545, 551 (7th Cir. 2011). Of course, that line does appear
in *Bartlett*. But *Bartlett* was describing a situation in which the
litigant had already argued the disputed issue before the rul-
ing—not excusing litigants from ever having to object after a
ruling. *See Bartlett*, 567 F.3d at 910 ("*But when an issue is argued
before the judicial ruling*, counsel need not take exception once
the court's decision has been announced.") (emphasis added).
And *Bartlett* emphasized that, in fact, a litigant *must* "protest
immediately after the ruling if [he] did not have an oppor-
tunity to argue the point earlier," which is required by Rule
51(b). *Id.* (citing FED. R. CRIM. P. 51(b)). That important caveat
was omitted from *Courtland*, which described Rule 51(a) as
broadly excusing litigants from ever making a post-ruling ar-
gument or objection, regardless of whether the issue was pre-
viously raised.[1]

Unfortunately, *Courtland*'s miscitation of *Bartlett* and Rule
51(a) created waves that rippled through our case law for
years to come. The problem did not go unnoticed; to the con-
trary, we repeatedly noted the "tension" between *Bartlett* and
*Courtland*. *See, e.g., United States v. Shannon*, 743 F.3d 496, 499–
500 (7th Cir. 2014). But *Courtland*'s overbroad description of

---

[1] *Courtland* was an unusual case, in which the district judge (without
warning) prepared his own research memorandum on dog fighting, dock-
eted it in advance of sentencing, and relied upon it at sentencing. 642 F.3d
at 547–49. The government argued that the defendant had waived his chal-
lenge to that memorandum because he never objected to its use below,
and this court disagreed. *Id.* at 551 (citing FED. R. CRIM. P. 51(a), 51(b)).
While that might have been correct under Rule 51(b), *see infra* n.2, it is
*Courtland*'s misleading description of Rule 51(a) that is relevant here.

Rule 51(a) nonetheless caught on in sentencing appeals like this one. In those cases, we repeatedly cited the same misleading *Bartlett* snippet to excuse defendants from objecting *at all* to sentencing explanations that they later claimed, on appeal, were erroneous. We reached that conclusion by incorrectly dubbing such arguments "exceptions" to sentencing "rulings" that were rendered "unnecessary" by Rule 51(a).

In *United States v. Pennington*, for example, we (like *Courtland*) cited *Bartlett* for the proposition that "the rules do not require a litigant to complain about a judicial choice after it has been made." 908 F.3d 234, 238 (7th Cir. 2018). In reliance on that misleading citation, we held that a defendant need not object to "the district court's explanation of its sentencing decision" in order to preserve *de novo* review on appeal. *Id.* (citing FED. R. CRIM. P. 51(a)). *Pennington*, in turn, has repeatedly been cited to establish that a defendant need not point out any errors in a "district court's explanation of its sentencing decision, regardless of whether it precedes or follows the announcement of the sentence itself," because the sentencing explanation "is a ruling to which an exception is not required." *United States v. Wood*, 31 F.4th 593, 597 (7th Cir. 2022) (discussing Rule 51(a)). These decisions thus conflate the outdated procedural device that is an "exception" with the fundamental requirement that parties make their arguments in district court, and then rely on Rule 51(a) to justify *de novo* review of issues never raised below.

**B.**

This, of course, is not what Rule 51(a) says at all. And although we have made this mistake many times, its repetition has not produced clarity. Just the opposite: Our accidental expansion of Rule 51(a) has led to its own body of confusing case

law, and (as a corollary) extensive briefing in simple cases like this one.

Having expanded Rule 51(a) to excuse parties from raising issues at sentencing, we soon faced awkward questions about the Rule's scope that have no answer in its text. We wrestled for years, for example, with the standard-of-review question in appeals challenging conditions of supervised release to which a defendant had not objected at sentencing. *See, e.g.*, *United States v. Kappes*, 782 F.3d 828, 843–44 (7th Cir. 2015) (collecting cases); *United States v. Speed*, 811 F.3d 854, 858–59 (7th Cir. 2016) (purporting to resolve the confusion by fashioning a bespoke standard-of-review test for these appeals). In some of those supervised-release cases, we began to differentiate between "definitive[]" and "tentative" sentencing explanations, finding that Rule 51(a) excused a defendant from objecting only to the former: Although a defendant need not point out errors in a "definitive[]" sentencing-related statement, we reasoned, he still must object to errors in a "tentative decision." *United States v. Gabriel*, 831 F.3d 811, 814 (7th Cir. 2016).

It turns out that distinguishing "definitive" from "tentative" statements by a district judge can require fine parsing of a sentencing transcript and very subtle distinctions. We face this question often, because it is common for a district judge to give a defendant or his counsel a final opportunity to speak near the end of a sentencing hearing, after the judge's own remarks. Indeed, we have encouraged judges to do so. *See United States v. Garcia-Segura*, 717 F.3d 566, 569 (7th Cir. 2013). Do these pauses in sentencing render the judge's prior remarks "tentative," such that a defendant must point out any errors in those remarks? Or does (our intermittent misinter-

pretation of) Rule 51(a) *still* excuse a defendant raising any errors that have occurred during the sentencing hearing? Again, we have struggled to answer that question, reaching different conclusions based on the precise language of the district judge's request for comment in cases that are not always easy to reconcile. *Compare, e.g., United States v. Kopp*, 922 F.3d 337, 341–42 n.2 (7th Cir. 2019) (holding defendant forfeited challenge to sentencing explanation because the court "paused to accept concerns or comments before finalizing the sentence," so "[t]here was ample opportunity for [defendant] or her attorney to raise an objection" and she did not), *with, e.g., United States v. Esposito*, 1 F.4th 484, 486–87 (7th Cir. 2021) (finding that district judge's "general invitation for objections" at hearing was insufficient to show defendant waived or forfeited his claim by failing to object).

We encounter similar fact patterns all the time, and unsurprisingly I am not the first to note our confusion. Just a few years ago in *United States v. Wood*, we undertook to resolve the "apparent disunity" in our case law and "uncertainty" about the standard of review in these mine-run sentencing appeals. 31 F.4th at 598. Attempting to reconcile our cases, *Wood* concluded that Rule 51(a) should excuse parties from presenting their arguments below only in "a distinct, narrow category" of "rare" cases in which the "grounds for appeal" were "created by the district court's ruling itself," like *Courtland*. *Id*. In these cases, *Wood* observed, a "litigant may elect to express his concern with the district court's action—indeed, allowing the district court the chance to correct any error before an appeal may be the most sensible response—[but] the rules do not obligate him to do so." *Id.*

Although *Wood* admirably took on this difficult issue, it

did not put it to bed. Limited by our post-*Courtland* precedent, *Wood* did not restore Rule 51(a) to its original meaning. Nor did it hew to *Bartlett*'s observation that the rules do, in fact, "require[] a protest immediately after the ruling if the litigant did not have an opportunity to argue the point earlier." 567 F.3d at 910 (citing FED. R. CRIM. P. 51(b)). *Wood* also optimistically described our Rule 51(a) expansion as applying only to a "rare" and "narrow" category of cases, 31 F.4th at 598, but the opposite has remained true: The issue arises in the *many* appeals in which defendants seek to challenge unpreserved errors that occurred during their sentencing hearings. *See, e.g.*, *United States v. Martin*, 109 F.4th 985, 988 (7th Cir. 2024) (applying *de novo* review because the defendant's "appeal is premised entirely on the adequacy of the district court's explanation of its sentencing decision" and under Rule 51(a), "a defendant who challenges the adequacy of that explanation on appeal need not have raised the objection below," even though after imposing the sentence "[t]he court then gave both parties an opportunity to voice any reason why they believed the court's sentence should not be imposed"). Indeed, we have continued to acknowledge "that we have not always applied a consistent standard of review" in cases challenging a district judge's sentencing explanation. *United States v. Richards*, 161 F.4th 490, 493 n.* (7th Cir. 2025), *cert. denied*, No. 25-7312, -- S. Ct. --, 2026 WL 1780087 (June 22, 2026).

## III.

This problem is once again front of mind because of cases like this one, which turn on the Supreme Court's recent decision in *Esteras*. An *Esteras* error—a district court's impermissible reliance on § 3553(a)(2)(A) when revoking supervised release—is precisely the type of error that would first arise dur-

ing sentencing and therefore implicate our Rule 51(a) precedent. *Esteras* has thus produced a new round of appeals (like this one) teeing up this question.

*Esteras* also directly undermines our interpretation of Rule 51(a). The Supreme Court in *Esteras* explained that when it comes to appellate review of the district judge's sentencing explanation, "[m]uch will turn on whether the defendant objects." 606 U.S. at 202. On one hand, if the defendant does object (and the district court fails to correct its own error), *de novo* review applies: "[I]f the error was not harmless, then the court of appeals should vacate the court's order and remand." *Id.* at 203. On the other hand, the Court explained that "[i]f the defendant does not make the district court aware that it may be impermissibly relying on § 3553(a)(2)(A), then the defendant's appeal will be governed by plain-error review." *Id.* at 202 (citing FED. R. CRIM. P. 52(b)).

That statement is irreconcilable with our Rule 51(a) precedents holding that a defendant need not point out any errors in "the district court's explanation of its sentencing decision" in order to preserve *de novo* review on appeal. *Pennington*, 908 F.3d at 238. We have made a few footnoted references to this problem, suggesting that *Esteras* does not disturb our precedents because it "was not discussing Federal Rule of Criminal Procedure 51(a)." *United States v. Stewart*, 148 F.4th 501, 509 n.3 (7th Cir. 2025); *Richards*, 161 F.4th at 493 n.*. But the Supreme Court would have no reason to discuss Rule 51(a) in this context, because—at least everywhere but the Seventh Circuit—Rule 51(a) has no bearing on a defendant's obligation to raise errors in the first instance.

*Esteras* thus provides us with an opportunity to correct our case law and guidance on how to do it. Cases like this one, in

which the standard-of-review question is much harder than the merits question, underscore the prudential reasons why we should bother to do so. Both criminal defendants and the government deserve clarity—as to when they must point out errors in sentencing proceedings, and what happens if they fail to do so. And district judges, who undertake the weighty moral task of determining and explaining criminal punishments, deserve the opportunity to correct any misstatements and address any issues that arise during the sentencing itself.

Rule 51(a), which concerns only "exceptions," does not and cannot provide that framework; our own case law is a testament to that. Instead, we should follow the Supreme Court's instructions and apply the normal issue-preservation requirements to sentencing appeals. Litigants must "inform[] the court" of "the action the party wishes the court to take, or the party's objection to the court's action," either "when the court ruling" is "made or sought." FED. R. CRIM. P. 51(b). If they fail to do so, plain-error review applies. *See* FED. R. CRIM. P. 52(b). Rule 51(a) has no bearing on that analysis. Instead, we should read Rule 51(a) for what it's worth—not much, anymore, other than to clarify that the antiquated "exceptions" procedure is not required.[2]

---

[2] Importantly, Rule 51(a) is not the only potential safety valve for criminal defendants who suffer from errors they had no opportunity to raise below. Rule 51(b) contains language that is right on point: "If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." FED. R. CRIM. P. 51(b). Unlike Rule 51(a), Rule 51(b)'s text helps answer questions about when, exactly, the lack of an argument below should be forgiven. Other circuits have thus relied on Rule 51(b) to deal with situations—like the odd one in *Courtland*—in which a litigant genuinely lacked opportunity to raise his point. *See, e.g.*, *United States v. Reyes*, 18 F.4th 1130, 1134 (9th Cir. 2021) ("In view

\* \* \*

In sum: We should reconsider our Rule 51(a) precedents, because they are inconsistent with the Rule's meaning, with Supreme Court precedent and the approach taken by our sister circuits, and with each other.

---

of the district court's interruption of defense counsel's objection, the court's ensuing considered explanation, and its concluding definitive comment that counsel's 'objection is noted,' we do not think that counsel was afforded 'any real opportunity to object' further.") (citation omitted); *United States v. Puentes*, 803 F.3d 597, 603 (11th Cir. 2015) (finding government did not have an opportunity to fully object to restitution order where prosecutor attempted to raise issue multiple times but was advised by the court to "[h]ave a seat"). We should do the same.